IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>GORDON SHIRAISHI (5),<br><br>Defendant. | CR. NO. 17-00582 JMS-RLP<br><br>ORDER GRANTING UNITED STATES' MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY, ECF NO. 394 |

**ORDER GRANTING UNITED STATES' MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY, ECF NO. 394**

The United States seeks an order in limine excluding Dr. Elizabeth Loftus ("Loftus") from testifying as an expert witness regarding the corruption of memory and related topics, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) ("*Daubert I*"). ECF No. 394. On March 6, 2019, the court held an evidentiary hearing, with Loftus as the sole witness. For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

The First Superseding Indictment ("FSI") charges Defendant Gordon Shiraishi ("Shiraishi") with several offenses alleging that he provided material false statements concerning the time of day on June 22, 2013 that former Honolulu Police Department ("HPD") Chief Louis Kealoha ("Kealoha") telephoned him and

reported that his home mailbox had been stolen. In particular, Shiraishi is alleged to have repeated the same general false statement — that he received a phone call from Kealoha around 9 a.m. on June 22, 2013 and then called HPD Lieutenant Derek Hahn and directed Hahn to send a technician to the Kealoha residence — on four separate occasions: 1) on April 30, 2015 before the Honolulu Ethics Commission ("Ethics Commission"), FSI at ¶ 37uu, ECF No. 164;[1] 2) on November 16, 2015 to the FBI, FSI at ¶ 37vv & count 10; 3) on January 6, 2016 to the FBI, FSI at ¶ 37yy; and 4) on January 7, 2016 to a federal grand jury, FSI ¶ 37zz & count 3.[2] Shiraishi now seeks to introduce expert testimony concerning the malleability of memory. The court begins with a description of the specific statements allegedly made by Shiraishi on each of these four dates.

During the April 30, 2015 Ethics Commission interview, Shiraishi stated that his phone call with Kealoha "was in the morning time, I think, about

[1] Although the FSI is silent as to whom Shiraishi's April 30, 2015 statement was made, the parties agree that this statement was made during an interview with the Ethics Commission. *See* ECF No. 445-2 (partial transcript of the recorded Ethics Commission interview).

[2] In his Notice of Expert Testimony, Shiraishi explains that "[t]he Government is expected to present evidence that the phone calls between Lt. Hahn and Mr. Shiraishi actually commenced that afternoon and that Mr. Shiraishi did not speak to [Kealoha] until that evening." ECF No. 368 at PageID # 2817-18.

around 9 or after; 9 a.m[.], sorry." ECF No. 445-2 at Page ID # 3827 (79:22-23).[3] When subsequently asked, "[t]he Chief called you about 9 a.m.?" Shiraishi responded, "[a]round there or maybe after. Wasn't like early in the morning." *Id.* at Page ID # 3828 (80:1-2).

The November 16, 2015 FBI interview is memorialized in an FBI 302, which states in part that "[o]n June 22, 2013, SHIRAISHI learned the mailbox was stolen. SHIRAISHI was at home, as it was a Saturday. [Kealoha] called SHIRAISHI about 9:00AM to inform him about the mailbox . . . ." ECF No. 445-3 at PageID # 3832.

On January 6, 2016, the day prior to his scheduled grand jury appearance, FBI special agent Nicole Vallieres ("Vallieres") interviewed Shiraishi. Although no FBI 302 appears to have been generated, the government submitted Vallieres' handwritten notes from that interview. ECF No. 477-1. At the very beginning of the notes (that is, on the top of the first page), Vallieres wrote:

> First aware of alleged mbx theft
> – Sat morning – contacted by Chief thru cell [phone number redacted]
> @ home watering lawn – @ 9:00 ish

[3] All of the exhibits cited in this Order were admitted into evidence during the March 6, 2019 *Daubert* hearing.

*Id*. at PageID # 4162. On the third page of her notes (that is, later during the interview), she wrote:

> [form shown (Niall Silva)]
> – recovered footage on 6/22/13 at 0859 hrs at Chief's house
> – understands he must have been made aware of stolen mbx before that

*Id*. at PageID # 4164. The parties agree that the Niall Silva "form" shown to Shiraishi on January 6, 2016 refers to a July 1, 2013 "Honolulu Police Department Follow Up Report" completed by former HPD Corporal Niall Silva ("Silva follow-up report"). In that report, Silva states he recovered video footage from the Kealoha residence "on 06/22/13 at about 0859 hours." ECF No. 445-4. The parties also agree that the Silva follow-up report is false. Specifically, the parties agree that Silva lied on this report, and in fact he did not recover video footage from the Kealoha residence "at about 0859 hours" on June 22, 2013.

On January 7, 2016, Shiraishi testified before Grand Jury 15-1, and was again shown Silva's follow-up report. ECF No. 445-10. But before being shown the Silva follow-up report, Shiraishi testified as follows:

> Q Did there come a time on or about the 22nd day of June, 2013, a Saturday, when you became aware of an incident that occurred at Chief Kealoha's house?
>
> A Yes.

Q Tell us about that.

A I was — it was a Saturday, so I was off duty. And this was in the morning time, 9:00 — after 9:00 or before 9:00 I can't tell you the exact time. But it was in the morning, and I was watering my yard. I remember that, and I received a phone call from the Chief.

*Id.* at PageID # 4052 (11:13-22).

Later, after Shiraishi was shown the Silva follow-up report, Shiraishi testified in the grand jury as follows:

Q I'm now showing you what's been previously marked as a Grand Jury Exhibit as NS-2.[[4]] Would you take a look at that, sir.

A Okay.

Q Do you recognize that official, Honolulu Police Department Follow-up Report?

A Yes.

. . . .

Q And do you recognize the signature at the bottom of the report?

A It appears that I — to be that of Niall Silva.

. . . .

[4] Grand Jury Exhibit NS-2 is Silva's follow-up report.

Q And does that report purport to document the retrieval of the video footage at Chief Kealoha's house?

A Yes. At that time the present house.

Q At the house where the alleged mailbox [theft] occurred?

A Yes.

. . . .

Q — okay.
So at what time does Corporal Silva report the retrieval of the video from the house?

A He has it written down as 0859 hours.

. . . .

Q Okay. So based upon the date on that report and the time, does that help you reflect upon the time when you might have received a call from the Chief?

A Well, it might have been before 9:00 obviously because I couldn't be sure; —

Q Right.

A — but it was in the morning.

Q Okay. So based upon that you got a call from the Chief before 9:00 o'clock because Mr. Silva would had to have been — you called Lieutenant Hahn who then called presumably Silva who then got

> dressed and got his car and drove to the Chief's house to get the video, right?
>
> A. Yes.

*Id*. at PageID # 4061-63 (19:2-8; 19:13-15; 19:20-24; 20:4-7; 20:15-21:2).

## II. ANALYSIS

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The court has the responsibility of acting as a gatekeeper to prevent unreliable expert testimony from reaching the jury. *Daubert I*, 509 U.S. at 589. In carrying out this responsibility, the court has discretion and flexibility in determining what evidence is relevant, reliable, and helpful to the trier of fact. *Cabrera v. Cordis Corp*., 134 F.3d 1418, 1420 (9th Cir. 1998); *United States v. Cordoba*, 104 F.3d 225, 228 (9th Cir. 1997) ("District courts must strike the appropriate balance between admitting reliable, helpful expert testimony and excluding misleading or confusing testimony to achieve the flexible approach

outlined in *Daubert*.") (quoting *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994)).

The Ninth Circuit has articulated a two-prong analysis for admissibility. First, the proffered testimony must be reliable, i.e., the expert's testimony reflects scientific knowledge, the findings are derived by the scientific method, and the work product amounts to "good science." *Daubert v. Merrell Dow Pharm.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") (citation and quotation signals omitted). Second, the testimony must meet the "fit" requirement, i.e., "it logically advances a material aspect of the proposing party's case." *Id*.[5]

For the reliability inquiry, the focus is on the expert's "principles and methodology, not on the conclusions that they generate." *Daubert I*, 509 U.S. at 595. "Scientific evidence is deemed reliable if the principles and methodology used by an expert are grounded in the methods of science." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1056 (9th Cir. 2003); *see also Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017). Accordingly, the expert's methods must be adequately explained. *United States v. Hermanek*, 289 F.3d 1076, 1094 (9th Cir. 2002); *see also Daubert II*, 43 F.3d at 1319 (holding that

[5] There is no per se rule for or against the admissibility of expert testimony regarding memory. Instead, the court applies the *Daubert* analysis on a case-by-case basis. *See United States v. Libby*, 461 F. Supp. 2d 3, 9-10 (D.D.C. 2006).

the expert must "explain the methodology . . . followed to reach [his or her] conclusions"); *Rincon*, 28 F.3d at 924 (explaining that the methods used by the expert must be described "in sufficient detail" such that the district court can determine if they are reliable). "For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (footnotes omitted); *see also Murray v. S. Route Mar. SA*, 870 F.3d 915, 925 (9th Cir. 2017).[6]

For the "fit" inquiry, the focus is "primarily" on "relevance." *Daubert I*, 509 U.S. at 591. "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.'" *Id.* (quoting 3 Weinstein & Berger ¶ 702[02], p. 702-18). But this inquiry is not merely a reiteration of the relevancy inquiry — "[e]xpert evidence can be both powerful and quite misleading

[6] The Supreme Court has listed non-exclusive factors to consider when determining whether to admit expert testimony under Rule 702. *See Daubert I*, 509 U.S. at 593-95. These include: "whether the theory or technique employed by the expert is generally accepted in the scientific community; whether it's been subjected to peer review and publication; whether it can be and has been tested; and whether the known or potential rate of error is acceptable." *Daubert II*, 43 F.3d at 1316. These are illustrative only, may not apply in every case, and are to be used flexibly. *Wendell*, 858 F.3d at 1232.

because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Id.* at 595 (citation and quotation signals omitted). "Federal judges must therefore exclude proffered scientific evidence under Rules 702 and 403 unless they are convinced that [the evidence] speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert II*, 43 F.3d at 1321 n.17. And to be admissible "the subject matter at issue must be beyond the common knowledge of the average layman." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002); *United States v. Hanna*, 293 F.3d 1080, 1086 (9th Cir. 2002).

Applying these standards, the court finds that Loftus' proffered testimony meets the "reliability" requirement, but fails the "fit" requirement because the testimony does not "logically advance[] a material aspect of" Shiraishi's case. *Daubert II*, 43 F.3d at 1315.

Loftus' testimony meets the "reliability" requirement. Loftus, a psychology professor at the University of California Irvine, is an expert in the study of human memory and a leading authority on how memory can be corrupted. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 325 (3d Cir. 2016) ("Elizabeth Loftus, a pioneering researcher in the field of human memory and

cognition, has thoroughly documented the effects of received information on memory accuracy.”). While initially reluctant to allow testimony about the malleability of memory, many courts now admit testimony similar to that proferred by Loftus. *See United States v. Rodriguez-Felix*, 450 F.3d 1117, 1123-24 (10th Cir. 2006) (“[M]odern research also recognizes that an eyewitness’s identification may be subject to significant witness error or manipulation. . . . Initially, courts were skeptical of this research, and almost uniformly rejected it. Many courts now, however, are proving receptive to admitting testimony based on this research.”) (citing an article authored by Loftus — Elizabeth F. Loftus & James M. Doyle, *Eyewitness Testimony* § 1-1 (3d ed. 1997 & Supp. 2005)); *see also United States v. Valencia-Cortez*, 2018 WL 6445875, at *2 (9th Cir. Dec. 10, 2018) (recognizing the “particularly unreliable nature of eyewitness identification evidence” and that it is “within a court’s sound discretion to provide both safeguards [(expert witness testimony and a comprehensive eyewitness jury instruction)] if the facts and circumstances of the case so require”).

During the *Daubert* hearing, Loftus explained the “misinformation effect,” where memories can be altered after receiving false post-event information. Loftus also testified about “confidence inflation” and how a person’s confidence in a memory is malleable and exposure to new information may inflate

a person's confidence in a memory. Thus, exposure to misinformation can impact both the recollection of a memory and the level of confidence in that memory recall.

In explaining these theories, Loftus relied on peer-reviewed articles that discussed a number of studies in these areas. *See, e.g.*, ECF No. 445-7 (peer-reviewed article reviewing studies about the malleability of memory); ECF No. 445-8 (peer-reviewed article reviewing studies about contamination of eyewitness self-reports). Loftus has conducted a number of these studies herself and is well-versed in the work of others in the field. Thus, the court finds that Loftus' theories on the malleability of human memory are reliable in that they are, among other reasons, "generally accepted in the scientific community," and have "been subjected to peer review and publication." *Daubert II*, 43 F.3d at 1316; *see, e.g.*, *Johnson v. Chappelle*, 2012 WL 1094345, at *3 (N.D. Cal. Mar. 30, 2012) (describing Loftus' expert testimony, which was admitted by the trial court, about "factors affecting human perception, memory, and identification"); *cf. Rodriguez-Felix*, 450 F.3d at 1125-26 ("The description of Dr. Clark's research [on factors affecting eyewitness identification] is wholly inadequate — it fails to indicate whether it has been subjected to peer review, whether it has been published, and whether it has been accepted by other psychologists in the field.").

Next, the court turns to *Daubert's* "fit" requirement. Shiraishi seeks Loftus' testimony to explain to the jury why Shiraishi may have claimed, during four separate interviews, that he spoke to Kealoha at approximately 9:00 a.m. on June 22, 2013 (when, in fact, that conversation was in the afternoon and evening). Loftus testified that providing Shiraishi with the false Silva follow-up report could affect his confidence in his memory as to the time he received the June 22, 2013 Kealoha phone call. For example, she explained that exposure to the false Silva follow-up report (during the FBI interview on January 6, 2016 and during the grand jury appearance on January 7, 2016) could impact Shiraishi's recollection and his confidence in that recollection, and that "one likely effect" of exposure to this misinformation would be to make Shiraishi more confident that the Kealoha phone called occurred prior to 9:00 a.m. Finally, Loftus explained that individuals gain confidence in a memory after engaging in repeated recollections of that particular memory (even absent being provided with any false or misleading information).[7]

---

[7] In his Notice of Expert Testimony, Shiraishi also states that "Dr. Loftus' testimony about how memories can fade over two years and how details can become somewhat inaccurate over that time will be relevant to this case." ECF No. 368 at PageID # 2818. This testimony falls within the common knowledge of the average layman, and thus is improper testimony under Rule 702. *See United States v. Labansat*, 94 F.3d 527, 530 (9th Cir. 1996) ("It is common knowledge that memory fades with time."); *United States v. Carter*, 410 F.3d 942, 950 (7th Cir.

(continued . . .)

Shiraishi thus argues that Loftus' explanation of the "misinformation effect" and "confidence inflation" may be helpful to the jury because his recollection of the time of the June 22, 2013 Kealoha phone call may have been altered in some way when shown the false Silva follow-up report. But the first three statements (one to the Ethics Commission and two to the FBI) could not reflect a corrupted memory — each was made prior to Shiraishi being shown the Silva follow-up report. That leaves, as Loftus testified, that exposure to the Silva follow-up report may have "solidified" Shiraishi's earlier estimate of the time of the Kealoha phone call. But this theory does not "fit" the evidence before the court — Shiraishi expressed his memory as to the time of the Kealoha phone call, and the confidence in that memory, in similar terms before and after reviewing the Silva follow-up report.

During his Ethics Commission interview, Shiraishi stated that the Kealoha phone call "was in the morning time, I think, about around 9 or after; 9 a.m[.], sorry." ECF No. 445-2 at PageID # 3827 (79:22-23). When then asked if Kealoha called him at about 9:00 a.m., he responded "[a]round there or maybe

---

(. . . continued)
2005) ("In general, however, jurors understand that memory can be less than perfect."); *Libby*, 461 F. Supp. 2d at 12 ("[J]urors inevitably encounter the frailties of memory as a commonplace matter of course."); *United States v. Heine*, 2017 WL 5260784 (D. Or. Nov. 13, 2017) (finding that memories are fallible and may deteriorate over time to be "within the ken of the ordinary juror").

after. Wasn't like early in the morning." *Id.* at PageID # 3828 (80:2). Next, on November 16, 2015, Shiraishi reportedly told the FBI that the Kealoha phone call took place "at about 9:00 a.m." ECF No. 445-3 at PageID # 3832. And then, on January 6, 2016, Shiraishi told Vallieres that he received the Kealoha call on Saturday morning while watering his lawn at "9:00 ish." ECF No. 477-1 at PageID # 4162. Only after these three statements — all placing the time of the Kealoha call "about around" 9:00 a.m., or "at about 9:00 a.m." or "9:00 ish" was Shiraishi shown the Silva follow-up report. And, most importantly, his testimony was strikingly similar even after shown the Silva follow-up report — in front of the grand jury, he testified that the Kealoha call was "in the morning time, 9:00 — after 9:00 or before 9:00 I can't tell you the exact time. But it was in the morning, and I was watering my yard." ECF No. 445-10 at PageID # 4053 (11:19-21). This approximation of the time is strikingly similar to "about around 9" or "at about 9:00 a.m." or "9:00 ish." In short, there was simply no "misinformation effect" or "confidence inflation." Instead, in each instance when asked about the time of the Kealoha phone call, whether before or after shown the Silva follow-up report, Shiraishi was clear that he was providing an estimated time — around 9:00 a.m.

Further, Silva's follow-up report states that he picked up the video surveillance footage at 8:59 a.m., which necessarily would have been after (not

before) Shiraishi initiated the investigation based on the Kealoha phone call. But Shiraishi never adopted Silva's version of events. Both before and after Shiraishi was presented with Silva's follow-up report, Shiraishi consistently testified that he received the phone call around 9 a.m. in the morning.[8]

Finally, Shiraishi also appears to argue that Loftus' testimony[9] would be helpful to the jury because Shiraishi may have become more confident in his mistaken recollection as he continued to retell his version of events on these four occasions (even absent being exposed to any false information). But, again, Shiraishi's recollection of the time of the Kealoha phone call is no more confident from the first time he told his version of events in front of the Ethics Commission

---

[8] After Shiraishi told the grand jury that the Kealoha phone call was "in the morning time, 9:00 — after 9:00 or before 9:00 I can't tell you the exact time. But it was in the morning, and I was watering my yard," ECF No. 445-10 at PageID # 4053 (11:19-21), the Assistant United States Attorney ("AUSA") showed Silva's follow-up report to Shiraishi. The AUSA then asked, based on the date and time on that report, "does that help you reflect upon the time when you might have received a call from the Chief?" *Id.* at PageID # 4062 (20:16-17). Shiraishi responded, "Well, it might have been before 9:00 obviously because I couldn't be sure[.]" *Id.* (20:18-19). This response does not indicate that Shiriashi adopted Silva's timeline (or otherwise had his memory manipulated), but rather demonstrates that his recollection did not change. That is, he said it "might have been before 9:00" given Silva's follow-up report, but that "I couldn't be sure." Further, nowhere does Shiraishi say that *his* memory is refreshed or that *he* now remembers that the time was different than around 9:00 a.m.

[9] Loftus testified about a theory concerning how retelling of memories can lead to increased confidence in the memory's accuracy. Loftus was unable to point to any studies supporting that theory at the hearing; however, on March 14, 2019, Shiraishi moved for leave to file a Supplement that included an article provided by Loftus on the theory. ECF No. 504. The court GRANTS the motion for leave to file the supplement, ECF No. 504.

to the last time he retold his version of events to the grand jury. Rather, Shiraishi continued to approximate the time — around 9 a.m.

In sum, the court does not question Loftus' expertise or qualifications. And the court certainly agrees that, in the right case, her testimony may aid a jury in understanding "misinformation effect" and "confidence inflation." But her testimony is simply not a fit for *this* case where the record does not show that Shiraishi's memory changed during the relevant time period. Thus, the court must exercise its gate-keeping role under *Daubert* and exclude Loftus' expert testimony.

## III. CONCLUSION

For the foregoing reasons, the United States' Motion in Limine is GRANTED.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, March 27, 2019.




/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*United States v. Gordon Shiraishi* (05), Cr. No. 17-00582 JMS-RLP, Order Granting United States' Motion in Limine to Exclude Expert Testimony, ECF No. 394